UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 8:20-cv-00325-MSS-AEP

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIAN DAVISON, | ) |
| BARRY M. RYBICKI, | ) |
| EQUIALT LLC, | ) |
| EQUIALT FUND, LLC, | ) |
| EQUIALT FUND II, LLC, | ) |
| EQUIALT FUND III, LLC, | ) |
| EA SIP, LLC, | ) |
| Defendants, and | ) |
| | ) |
| 128 E. DAVIS BLVD, LLC, | ) |
| 310 78TH AVE, LLC, | ) |
| 551 3D AVE S, LLC, | ) |
| 604 WEST AZEELE, LLC, | ) |
| 2101 W. CYPRESS, LLC, | ) |
| 2112 W. KENNEDY BLVD, LLC, | ) |
| 5123 E. BROADWAY AVE, LLC, | ) |
| BLUE WATERS TI, LLC, | ) |
| BNAZ, LLC, | ) |
| BR SUPPORT SERVICES, LLC, | ) |
| BUNGALOWS TI, LLC, | ) |
| CAPRI HAVEN, LLC, | ) |
| EA NY, LLC, | ) |
| EQUIALT 519 3RD AVE S., LLC, | ) |
| MCDONALD REVOCABLE LIVING TRUST, | ) |
| SILVER SANDS TI, LLC, | ) |
| TB OLDEST HOUSE EST. 1842, LLC, | ) |
| | ) |
| Relief Defendants. | ) |
| | ) |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## I.    **INTRODUCTION**

1.      The Commission brings this emergency action to halt an ongoing fraud conducted by EquiAlt LLC ("EquiAlt"), a private real estate investment company. Beginning in 2011 to the present, Defendants EquiAlt, Brian Davison ("Davison") and Barry Rybicki ("Rybicki") conducted a scheme to defraud, raising more than $170 million from over 1,100 investors nationwide, many of them elderly, through fraudulent unregistered securities offerings. Defendants promised investors that substantially all of their money would be used to purchase real estate in distressed markets in the United States and their investments would yield generous returns. Instead, EquiAlt, Davison, and Rybicki misappropriated millions in investor funds for their personal benefit.

2.      Despite receiving over $170 million in investor funds, the revenues generated by EquiAlt's real estate portfolio have been significantly less than the amounts of interest owed to investors. Without sufficient revenues to pay the money owed to investors, the Defendants, in classic Ponzi scheme fashion, resorted to using new investor money to pay the returns promised to existing investors. Meanwhile, Davison and Rybicki paid themselves millions from the EquiAlt companies and spent this money on luxury automobiles, fine jewelry and chartering private jets, among other expenditures.

3.      In addition to conducting a Ponzi scheme and misappropriating investor money, Davison and Rybicki made material misrepresentations and omissions in order to sell the investments to investors. The investments—unregistered securities in the form of debentures issued by four real estate investment funds managed by EquiAlt—were falsely touted to investors as "secure," "safe," "low risk," and "conservative." Davison and

Rybicki also falsely touted that the investments had earned millions of dollars in profits, all the time knowing that since at least 2016 the investment funds' revenues failed to cover even their own expenses. Moreover, Davison and Rybicki paid significant sales commissions to numerous unregistered sales agents who sold investments to unaccredited and unsophisticated investors in various states.

4.     At all times relevant to the allegations herein, Davison and Rybicki exercised control over the business operations of EquiAlt and its four real estate investment funds: EquiAlt Fund, LLC ("Fund 1"), EquiAlt Fund II, LLC ("Fund 2"), EquiAlt Fund III ("Fund 3"), and EA SIP, LLC ("EA SIP Fund") (collectively the "Funds"). Although their responsibilities overlapped to some extent, Davison primarily controlled the accounting, finances, bank accounts, and real estate strategy. Rybicki primarily controlled communications with investors, marketing, debenture terms, fundraising, and the relationship with and commission payments made to unregistered sales agents. Rybicki also executed agreements with investors, including debentures and subscription agreements containing numerous representations and warranties. The two principals communicated frequently about the Funds' operations, and worked jointly on the Funds' strategic planning and administration.

5.     Investor money has been misused, commingled, and misappropriated in several distinct ways, including (a) money from one Fund used to purchase real estate for another Fund or for third party entities owned by Davison; (b) money from one Fund used to pay investors in another Fund; (c) substantial undisclosed commissions paid to unregistered sales agents; (d) substantial undisclosed fees such as due diligence fees, management fees,

success fees, auction fees, underwriting fees, and purchase discount fees paid to EquiAlt and Davison; and (e) substantial improper distributions of cash to Davison and Rybicki in "bonuses" and "principal return."   As a result of this misuse and misappropriation of millions of dollars of investor funds, Fund 1, Fund 2, and the EA SIP Fund are in a precarious financial condition.

6.      The combined assets of EquiAlt and its three active funds (Fund 1, Fund 2, and the EA SIP Fund) are insufficient to repay the principal and interest owed to investors. EquiAlt has many debentures for which the maturity date has already passed that continue to accumulate on a month-to-month basis. By December 2019, the three active Funds had issued debentures that had matured totaling $39.7 million in principal and interest. As of December 2019, the combined current assets of EquiAlt and the three active Funds were insufficient to repay the principal and interest owed to investors for the debentures that had matured. By December 2020, matured debentures will accumulate to approximately $68.9 million in principal and interest.  Thus, the combined assets of the three active Funds are insufficient to pay investors the principal and interest that will be owed to them at the end of this year.

7.      As a result of the conduct alleged in this Amended Complaint, all the Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c); Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants Davison and Rybicki also, directly and indirectly, violated the anti-fraud provisions of the Exchange

4

Act as Control Persons of EquiAlt under Section 20(a) of the Exchange Act, 15 U.S.C. §

78t(a).  Finally, Defendants EquiAlt, Davison, and Rybicki have also aided and abetted

violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).  Unless restrained and

enjoined, EquiAlt, Davison, and Rybicki are reasonably likely to continue to violate the

federal securities laws.

8.      Relief Defendants have all received proceeds of the fraud without any legitimate

entitlement to the money.

9.      To halt this ongoing fraud, maintain the status quo, and preserve investor assets,

the Commission seeks several forms of relief, including maintenance of the asset freeze

currently in place, and the Court's continued employment of the appointed Receiver.  The

Commission also seeks permanent injunctions and civil money penalties against all the

Defendants, and disgorgement of ill-gotten gains against the Defendants and Relief

Defendants.

## II.      DEFENDANTS AND RELIEF DEFENDANTS

### A. Defendants

10.      **DAVISON** is a resident of Tampa, Florida.  During all relevant times Davison

was EquiAlt's owner and Chief Executive Officer and together with Rybicki maintained

control over the Funds.  Davison personally controlled the bank accounts, finances, and

accounting for each of the Funds.  Davison was in control of most of the real estate

activities and administrative activities of the Funds.  Davison was also in charge of the

Funds' strategic planning and administration.  Davison is not, and has never been,

registered with the Commission, FINRA, or any state securities regulator.  Davison, through his ownership of EquiAlt, owns Fund 1, Fund 2, Fund 3, and the EA SIP Fund.

11.    **RYBICKI** is a resident of Phoenix, Arizona.  During all relevant times, Rybicki held various titles at EquiAlt including, Managing Director, Vice President, and President, and together with Davison maintained control over the Corporate Defendants.  Rybicki's activities were largely directed toward soliciting and raising money from investors.  Rybicki, along with Davison, revised and approved changes to Fund offering materials; signed debentures and subscription agreements; created, reviewed, and approved marketing materials, quarterly performance updates, and account statements sent to investors; recruited and supervised unregistered third-party sales agents; paid commissions; and developed and administered the Funds' redemption policy.  Rybicki was also in charge of the Funds' strategic planning and administration.  Rybicki communicated directly with investors, and raised money from investors for the Funds.  Rybicki is the owner of Relief Defendant BR Support Services, LLC, which provided investor-related services to EquiAlt.  In addition to the millions he received in commissions from the Funds, Rybicki also received more than $3.7 million from the Funds for "return of principal."  Rybicki is not, and has never been, registered with the Commission, FINRA, or any state securities regulator.

12.    **EQUIALT** is a Tampa, Florida-based limited liability company not registered with the Commission in any capacity with no publicly traded stock.  Formed in 2011, EquiAlt's primary business is to manage Fund 1, Fund 2, Fund 3, and the EA SIP Fund,

and has approximately twelve employees in three states.  During all relevant times, EquiAlt has been owned by Davison.

13.    **FUND 1** is a Nevada limited liability company formed on May 23, 2011.  On July 19, 2011, Fund 1 filed with the Commission a Form D notice of exempt offering of debentures pursuant to Rule 506 of Regulation D of the Securities Act ("Rule 506") seeking to raise $50 million from investors. On August 13, 2019, Fund 1 filed an amended Form D notice under Rule 506 seeking to raise $125 million from investors.  Fund 1 has raised approximately $110 million from 733 investors during the period January 2011 through November 2019.

14.    **FUND 2** is a Nevada limited liability company formed on April 24, 2013.  On April 4, 2016, Fund 2 filed with the Commission a Form D notice of exempt offering of debentures pursuant to Rule 506 seeking to raise $20 million from investors.  On September 1, 2017, Fund 2 filed an amended Form D notice under Rule 506 seeking to raise $50 million from investors.  Fund 2 has raised approximately $39 million from 266 investors during the period 2013 through November 2019.

15.    **FUND 3** is a Nevada limited liability company formed on June 26, 2013. Fund 3 (now closed) raised approximately $2.6 million from investors during the period July 2013 through December 2015.

16.    **EA SIP Fund** is a Nevada limited liability company formed on May 23, 2016. On August 8, 2016, the EA SIP Fund filed with the Commission a Form D notice of exempt offering debentures pursuant to Rule 506 seeking to raise $50 million from investors.  The

EA SIP Fund has raised $21.7 million from 138 investors during the period April 2016 through November 2019.

**B. Relief Defendants**

17.  **128 E DAVIS BLVD, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

18.  **310 78TH AVE, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

19.  **551 3RD AVE S, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

20.  **604 WEST AZEELE, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

21.  **2101 W. CYPRESS, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

22.  **2112 W. KENNEDY BLVD, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

23.     **5123 E. BROADWAY AVE, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

24.     **BLUE WATERS TI, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

25.     **BNAZ, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud.

26.     **BR SUPPORT SERVICES, LLC** is an Arizona limited liability company which received investors' proceeds emanating from the Defendants' securities fraud. Rybicki owns BR Support Services which provided investor-related services to EquiAlt, and has collected millions in commissions from the Funds.

27.     **BUNGALOWS TI, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

28.     **CAPRI HAVEN, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

29.     **EA NY, LLC** is a New York limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

30. **EQUIALT 519 3RD AVE S., LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

31. **MCDONALD REVOCABLE LIVING TRUST** is a trust which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds. Davison is both the Trustee and a beneficiary of the Trust. Davison improperly directed that millions of dollars from EquiAlt and the Funds be sent to the Trust as "principal return."

32. **SILVER SANDS TI, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

33. **TB OLDEST HOUSE EST. 1842, LLC** is a Florida limited liability company which received investors' proceeds emanating from the Defendants' securities fraud and holds assets belonging to the Funds.

34. By order of this Court, EquiAlt, the Funds, and the Relief Defendants are under the control of a Receiver.

### III.     JURISDICTION AND VENUE

35. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and 21(d), 21 (e), and 27 of the Exchange Act, 15 U.S.C. §§78u(d), 78u(e) and 78aa.

36. This Court has personal jurisdiction over the Defendants and venue is proper in the Middle District of Florida because Davison resides in the District, EquiAlt has its

principal place of business in the District, and the Funds' business operations have been conducted in the District. Furthermore, much of the conduct constituting the fraud alleged in this Amended Complaint has occurred in the Middle District.

37.    In connection with the conduct alleged in the Amended Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.    FACTS

### A. EquiAlt and Its Control Persons

38.    At all relevant times, Davison owned EquiAlt, whose primary business was to manage the operations of the Funds. Davison and Rybicki worked jointly to establish the Funds' sales operations and investor communications, and the two communicated frequently and regularly regarding the status of the Funds. Although there was overlap, Davison and Rybicki largely split their primary functions.

39.    Davison, the CEO, formed EquiAlt in 2011 and had signature authority over the bank accounts for EquiAlt and the Funds. Davison controlled the real estate investment portfolio and the Funds' day-to-day activities and general affairs. He supervised and directed the controller and accounting personnel for the company. He also signed numerous debentures and checks authorizing the use of new investor proceeds to make interest payments to old investors, and checks misappropriating money to himself and Rybicki.

40.    Rybicki primarily controlled the sales force and communications with investors. Rybicki signed investor debentures and subscription agreements as EquiAlt's "Managing Director" and is listed as "Executive Officer" and "Promoter" in Fund 1's August 13, 2019 amended Form D.  Both Davison and Rybicki reviewed, revised, and made changes to private placement memoranda ("PPMs"), debentures, and subscription agreements for the Funds.    In addition, Rybicki created, reviewed, or approved changes to marketing materials, quarterly performance updates, and account statements that were sent to investors.  According to Davison's sworn testimony, control over the distribution and dissemination of the Funds' PPMs was within Rybicki's scope of responsibility or within "[h]is wheelhouse so to say."  Rybicki also controlled the distribution or dissemination of the Funds' offering documents to prospective investors, such as the debentures and subscription agreements.

41.    Rybicki was otherwise primarily responsible for raising money for the Funds from investors.    In this regard, Rybicki managed EquiAlt's relationships with various third-party sales agents (acting as unregistered broker-dealers) who sold the Funds' securities. Rybicki recruited these sales agents and provided these agents with marketing and offering materials that were used to sell the Funds' securities to largely elderly and unsophisticated investors. He also provided EquiAlt's President of Business Development and Marketing with marketing materials, quarterly performance updates, and offering materials to send to investors.  Rybicki even advised third-party sales agents that neither a license nor registration were required to sell EquiAlt securities.  Rybicki also met with investors and solicited investments in the Funds directly.

12

42.     Rybicki along with Davison controlled the debentures' terms, including the interest rate, lock-up period, and the amount of commission paid.  Furthermore, Rybicki reviewed and approved all requests for commission payments.  Indeed, almost all of the commission payments made to the unregistered third-party agents were made by Rybicki's company, BR Support Services.

43.     Rybicki managed the redemption process.  Rybicki, along with Davison, decided whether to approve early redemption requests by investors who sought the return of principal before the maturity date.  Rybicki also revised the Funds' redemption policy in 2019 to address cash flow liquidity problems.

### B. EquiAlt Offerings

44.     In marketing materials and through its website, EquiAlt claims to own a portfolio of revenue-generating condominiums and single and multi-family homes.  Meanwhile, the PPMs for the Funds state that the investment objective of the Funds is to purchase and sell single-family properties in distressed real estate markets in the U.S. and participate in opportunistic lending in the U.S.  In marketing materials provided to prospective investors, EquiAlt boasts that its programs or offerings "protect against market conditions" and are "not susceptible to interest rate hikes & lending trends."  EquiAlt also claims to provide commercial lending investments to construction and development projects, "filling in the gaps left by local community banking systems."

45.     From January 2011 to November 2019, EquiAlt raised more than $170 million from some 1,100 investors though the sale of fixed rate debentures issued by the Funds.  Of that total, $145 million was raised from January 2015 through November 2019.  These

debentures are securities within the meaning of Section 2(a)(1) of the Securities Act and

Section 3(a)(10) of the Exchange Act.  EquiAlt continued to market and raise funds from

investors up until the time that the SEC filed its original Complaint on February 11, 2020.

46.    Defendants sold investors securities consisting of 3 to 4 year term debentures of

the Funds providing a fixed annual return of generally 8 % to 10%.  Many of the investors

were elderly, retired and used IRAs to fund their investments in the Funds.  Furthermore,

many of the investors were unaccredited or unsophisticated in that they lacked knowledge

and expertise in financial or business matters, were not capable of evaluating the merits

and risks of the investment, and were not otherwise capable of bearing the economic risks

of the investment.   Many of the investors were attracted by representations that the

investments in the Funds were "secure," "safe," "low risk," and "conservative" and by

assurances that EquiAlt could not go bankrupt.

47.    EquiAlt used in-house employees and unregistered external sales agents and

financial advisors to solicit investments from the general public through cold calling

campaigns, social media, websites, and in-person meetings.  This sales force was amassed

in large part by Rybicki.  Even though Davison and Rybicki were advised on multiple

occasions by attorneys for various sales agents that this method of sales may violate

securities laws, Davison and Rybicki persisted in using this method of solicitation to

investors.  Indeed, Davison and Rybicki misrepresented to outside sales agents that it was

permissible for these agents to sell these securities while not registered with state and

federal regulatory authorities. This solicitation method continued even after the State of

California's Department of Business oversight issued a cease and desist order in October

2018 to one of EquiAlt's outside sales agents ordering him to refrain from conducting business as an unregistered broker-dealer by selling the Funds, which were deemed to be securities.

## C. Fraudulent Conduct

### i.     The Defendants Are Conducting a Ponzi Scheme

48.     Despite the fact that some actual real estate operations were occurring, the Funds have operated as a Ponzi scheme since at least 2016. More specifically, in a classic Ponzi-scheme fashion, the Funds are paying investors their monthly interest payments for the debentures by raising and using new investor funds to pay old investors. While Fund 3 is now closed, Fund 1, Fund 2, and the EA SIP Fund have collectively been raising from investors approximately $2-3 million per month since January 2018, and have raised more than $170 million from investors.

49.     Notably, by 2016, the interest owed to the Funds' investors greatly exceeded revenues generated from the Funds' business operations. Since at least 2016, the Funds' revenues from property rentals, sales of properties or other sources (other than investor funds) have been insufficient to meet the overwhelming debt service obligations created by the debentures that were being sold. For example, in December 2016, non-investor revenues for the Funds for the month were only $1.16 million while distributions to investors that month were $2.29 million. Thus, more than $1.127 million of new investor funds were used to cover the debt service to investors in December 2016. These distribution deficits continued month after month causing Defendants to use new investor money to service old investors' payouts ultimately totaling millions each year. Indeed, in

2019, the deficit between non-investor revenues and distributions to investors totaled more than $12 million for the year. That millions of dollars of new investor funds were used to service the interest owed to old investors was never disclosed to investors.

50.     Moreover, this scheme was unsustainable. Even if Fund 1, Fund 2 and the EA SIP Fund were able to liquidate their real estate holdings at the values stated in their internal books and records, the Funds' combined assets would fall millions of dollars short of the amounts owed to investors. In February 2020, more than $39 million of principal payments were overdue and the debentures were in default. By the end of December 2020, that number increases to about $68.9 million. The shortfall between what is owed to investors and EquiAlt's predicted revenues and asset value grows even larger over time as additional agreements mature and revenues remain flat. The real estate holdings' are simply insufficient, both in revenues and value (even if they increase in value significantly) to support this house of cards organizational model.

ii.     **Misappropriation of Investor Funds**

51.     Defendants Davison and Rybicki have misappropriated millions of dollars from the Funds for their own personal benefit. In fact, between 2017 and 2018, Davison and Rybicki received improper cash distributions listed on the books as "annual bonuses," "principal returns," and "principal reduction payments" totaling more than $11.5 million from the Funds. Of these, Davison received about $7.8 million and Rybicki about $3.7 million. Nothing in the PPMs or other offering documents provided for such payments or informed Fund investors that Davison and Rybicki could avail themselves of such

distributions and bonuses. Moreover, no one else at EquiAlt received similar "principal returns," only Davison and Rybicki.

52.    Davison and Rybicki often used this money to purchase high-end luxury items. Davison alone spent more than $14 million of EquiAlt's funds on personal luxury items such as cars, (including multiple Ferraris, a Bentley, a Rolls Royce, and a Pagani), jewelry, and chartering private jets. In addition, Davison also used more than $4 million taken from Fund I and EquiAlt to pay off personal credit card debt. In April 2017, Davison also took cash distributions from several of the Funds totaling $1.8 million and used the money to pay personal back income taxes owed to the Internal Revenue Service. Rybicki similarly purchased a Ferrari, Porsches, luxury watches, and an interest in a soccer team with the monies he received from EquiAlt and the Funds.

53.    In addition to these improper cash distributions, Davison used money taken from the Funds to purchase real estate for his own benefit. Specifically, Davison diverted more than $600,000 directly from Fund I's account (and an additional $1.9 million from EquiAlt's accounts) to pay for his personal residence. Another $2.7 million was diverted from Fund I, to pay for a Manhattan condominium (held in the name of Relief Defendant EA NY, LLC) which has never generated any income for the Funds, despite having been purchased several years ago with investor money. Instead, Davison stays at the condominium when visiting New York and Davison included it among lists of his personal assets. In addition, another Tampa property, 2101 W. Cypress, was purchased by Fund I in 2017, and refurbished to become a garage to store Davison's personal car collection. Davison misappropriated approximately $803,888 from Fund I to purchase and refurbish

the Cypress property.  However, Davison never paid the Funds back the money he used to purchase and improve any of these properties, despite having purchased the properties several years ago with Fund money.  Nothing in the Fund documents provided that Davison could use money from the Funds to purchase property for his own personal use.

### iii.    **Misuse of Investor Funds**

54.     Instead of investing their funds as promised, the Defendants have misused millions of investors' dollars in a manner inconsistent with the PPMs and account statements provided to investors, drafted and approved by Davison and Rybicki.

55.     More specifically, the PPMs for Fund 1, Fund 2, and the EA SIP Fund state that investor money would be used to purchase, own, improve and/or sell real property and included a detailed chart of "projected sources and uses of cash."  The chart, however, identified only the following six specific uses of that cash: investments in property, accounting and tax preparation, legal costs, investor relations and communications expenses, marketing and sponsorship event fees, and miscellaneous expenses and reserves. While the PPMs for these Funds state that "All uses of proceeds are estimated and subject to change," only the above six specific uses of investor proceeds are delineated in the document.  An example of one of the charts included in the PPMs for Fund 1 is set forth below (the other Funds' PPMs contain similar charts):

18

| SOURCES: | | |
|---|---|---|
| Debentures: | | $50,000,000.00 |
| TOTAL SOURCES: | | $50,000,000.00 |

| USES: | |
|---|---|
| Investment in Property | $45,000,000.00 |
| Accounting and Tax Preparation | $550,000.00 |
| Legal Costs | $250,000.00 |
| Investor Relations and Communications Expenses | $2,500,000.00 |
| Marketing and Sponsorship Event Fees | $200,000.00 |
| Miscellaneous Expenses and Reserves | $1,500,000.00 |
| **TOTAL USES:** | **$50,000,000.00** |

56.     Despite the restrictions of use contained in the PPMs, the Defendants misused investor funds in several ways, including (a) using money from one Fund to purchase real estate for another Fund or for third party entities owned by Davison; (b) using money from one Fund to pay investors in another Fund; (c) paying substantial undisclosed commissions to unregistered sales agents; (d) substantial undisclosed fees such as due diligence fees, management fees, success fees, auction fees, underwriting fees, purchase discount fees, and bonuses paid to EquiAlt and Davison; and (e) substantial improper cash distributions to Davison and Rybicki.  The misuse of investor funds continued over a period of several years and totaled millions of dollars.

### D.  Misrepresentations and Omissions to Investors

#### i.     False Claims About Use of Investor Funds

57.     The Defendants have misrepresented to investors how their money would be used by the Funds.  For example, the PPMs for Fund 1, Fund 2, and the EA SIP Fund

indicate that approximately 90% of investor funds would be used to "invest in property." Yet, less than 50% of investor funds were actually used for that purpose. Indeed, a substantial part of the remaining funds were used for improper purposes such as the payment of millions of dollars in fees, principal returns, and bonuses to Davison, Rybicki and others. The offering documents or marketing materials sent to investors did not include any of these fees. Davison and Rybicki both controlled the content included in the PPMs. Critically, both Davison and Rybicki oversaw the distribution of these to investors knowing that the PPMs and investor account statements misrepresented how investor funds would be used. In addition, both Davison and Rybicki allowed these misrepresentation to continue for years without correcting the misrepresentations in the PPMs and other offering documents.

58.     In addition to the PPMs, Rybicki, or others under his direction, supervision or control, provided account statements to investors showing that almost 90% of investors' funds were invested in real estate.

59.     Defendants, as the persons who controlled the Funds' financial, sales and marketing activities, also knew, or had access to, specific information about the Funds' financial status or condition. More specifically, Davison had knowledge of the Funds' bank accounts and access to the Funds' accounting software containing detailed information about the Funds' finances. Rybicki had knowledge of information concerning the Funds' real estate investments, liquidity, and the revenues generated by the Funds' real estate holdings. As a result of their knowledge of, or access to, this financial information

Rybicki and Davison knew or were reckless in not knowing that EquiAlt was not investing the Funds' assets as promised.

60.     The Defendants also failed to disclose the various fees being paid by the Funds to EquiAlt. As alleged above, the PPMs for Fund 1, Fund 2, and the EA SIP Fund disclosed a list of specific uses of investor funds. This list, however, did not disclose that the Funds would use investor money to pay EquiAlt extraneous fees described above totaling millions of dollars. For example, although not disclosed to investors, the Funds paid EquiAlt a so-called "discount fee" or the difference in the listed sales price for a particular property and the ultimate purchase priced paid by the Fund to acquire such property. Instead of benefiting from a lower ultimate sales price for the property, the Funds paid the actual cost savings to EquiAlt as a discount fee. No aspect of this fee was ever disclosed to investors who were already paying substantial management and other fees to EquiAlt supposedly to manage the Funds.

61.     Defendants knew or were reckless in not knowing that the Funds were paying these undisclosed "discount fees" to EquiAlt. Davison specifically directed that the discount fee be taken. For his part, Rybicki was given a profit and loss statement for February 2017 which specifically reported that EquiAlt had generated "discount fee income" totaling $605,000 in connection with Fund 1. This and other documents indicate that Rybicki was privy to financial information about the nature and amount of undisclosed fees paid by the Funds to EquiAlt.

62.     The Defendants also failed to disclose to investors that more than $6.61 million of investor money would be transferred between the Funds with the money raised by one

Fund being used to pay the debts and obligations of another Fund. For example, in December 2015, Fund 1 and Fund 2 transferred, respectively $1.29 million and $1.08 million to Fund 3, which Fund 3 used to pay approximately $2.3 million in principal and interest to its investors. Although Fund 3 transferred title to the properties it held to Funds 1 and 2, the value of the properties was far less than the $2.3 million that Funds I and 2 had transferred to Fund 3. Certainly, Fund 3 could not have paid its investors without the cash infusion from Funds 1 and 2.

63.     The Defendants also failed to adequately disclose to investors that their funds would be used to pay commissions to unregistered third party sales agents. First, many of the subscription agreements signed by Rybicki stated that investments in the Funds were being sold without the payment of a commission. Furthermore, while the PPMs provided to investors stated that the Funds "may" pay commissions to sales agents, in reality commissions were *always* paid in connection with the sale of the Funds' investments. In addition, in many cases investors never received the PPMs and were not informed about any commission being paid in connection with their investment.

64.     Rybicki knew that many of the subscription agreements he signed with investors falsely stated that investments in the Funds were being sold "without commissions." When in fact, commissions were paid to outside sales agents as directed by Rybicki. Indeed, emails between Rybicki and EquiAlt's accounting controller indicate that Rybicki controlled the decision whether commissions would be paid to various unregisered sales agents in connection with the sale of the Funds' securities.

65.     Rybicki also knew his representations to investors about commissions were false as it was his role to recruit and pay the sales agents' commissions. In fact, over a period of several years the Funds have paid commissions (primarily to Rybicki or BR Support Services) totaling approximately $25 million using investor money. Rybicki, or those acting at his direction, would distribute commission amounts to the sales agents (generally 6% of the invested money) and Rybicki and BR Support Services would retain the remaining funds. Of the $25 million received in commissions, about $13 million was distributed to third-party unregistered sales agents.

66.     Rybicki was, at a minimum, reckless when he failed to tell investors that EquiAlt was using their investment funds to pay millions in commissions to unregistered sales agents. As early as 2014, Davison and EquiAlt's accountants provided Rybicki with copies of the Funds' financial statements highlighting the Funds' financial results, financial position, investment interest paid to investors and cash flows. The Funds' financial statements show that EquiAlt was using investor proceeds to pay millions in commissions to unregistered sales agents.

67.     Rybicki also had access to information concerning the financial status and performance of the Funds and was privy to information concerning the Funds' expenses such as the amount of interest being paid to investors on the debentures. Numerous email communications between EquiAlt's accountant and Rybicki indicate that Rybicki was informed about a wide range of financial matters relating to the Funds such as transfers of money among the Funds, distributions to investors, commission payments, and redemptions. Davison likewise provided Rybicki with important information about the

Funds' financial performance such as weekly cash flow reports detailing, among other things, the Funds' cash inflow and outflows. Davison had access to all the accounting records of EquiAlt and the Funds.

68.   Both Davison and Rybicki were directly involved in matters concerning the Funds' daily financial operations and activities including important matters such as ensuring that the Funds had adequate capital to cover redemptions. One email that is particularly illustrative shows the level of Rybicki's involvement in the Funds' financial matters. In an email dated August 22, 2017 between Rybicki and a sales agent about the renewal of an investment, Rybicki wrote:

> Back when we were doing that I was trying to get ahead of the redemptions etc...because they were larger paybacks if they didn't renew and therefore the strategic thing to do was either renew them or make sure we were capitalized enough to pay them back and keep operating business as usual. ...
>
> Bottom line on that is that we have to protect the fund, that is job number 1 and sometimes the best way to do that is to get in front of those redemptions one way or another. ...

69.   Investors were also misled about the payment of management fees to EquiAlt. Although EquiAlt collected substantial management fees from the Funds, many investors were expressly told that no management fees would be paid to EquiAlt. For example, EquiAlt's President of Business Development and Marketing stated to Fund 2 investors in writing that EquiAlt had no management fees.

70.   Moreover, although the PPMs for all the Funds state that "the Manager will receive Management Fees as set forth in the Operating Agreement and as described more fully below," there is no description elsewhere in the PPMs (or in the Operating

Agreements, which were not sent to investors) of what or how the management fees would be paid. Nowhere in the offering materials is there any disclosure to investors that EquiAlt and Davison would receive more than $6.67 million in "management fees" from the Funds or of the millions of dollars in other fees, Davison and Rybicki received, as described above.

71.     The misrepresentations were repeated in Account Statements Rybicki drafted and sent to investors, which falsely represented that 88% -90% of Fund I's holdings were in real estate and 10% -12% was in "working capital."

### ii.     False Statements About Risk

72.     Investors were misled about the safety and risk of their investments both orally and in writing. While pitching investments in the Funds, the Defendants represented that the investments were "low risk," "safe, and "conservative." Investors were even told that the Funds had "never lost investor dollars since inception." The investments, however, were anything but low risk, safe or conservative. In fact, the Funds have suffered substantial financial losses since their inception. Both Davison and Rybicki were aware that the Funds were operating at a loss and using new investor money to pay the interest payments owed to current investors. Despite this knowledge, Davison and Rybicki continued to deplete the Funds monies for their own use. Indeed, Davison and Rybicki have depleted the Funds' assets through a years-long scheme involving outright misappropriation and misuse of investor funds.

73.     Davison and Rybicki also made false statements about the Funds' prior performance. For example, investors were falsely told that Fund 3 realized a net profit of

approximately $300,000 over a 24-month period and that Funds 1, 2 and the EA SIP Fund
had accrued an estimated unrealized profit of $18 million over the life of the Funds.

74.     Rybicki and Davison exercised control over the drafting of marketing materials
and "fact sheets" that falsely stated that "assets are quickly brought to cash flowing (28 day
average)," "Investors principal is not brokered or lent on someone else's asset" and that
EquiAlt had a "successful Track Record During the Downturn" and has "one of a few
management teams that have operated successfully throughout the downturn of our "great
recession'."

75.     Rybicki and Davison exercised control over the representations made to
investors concerning the risk of investing in the Funds and knew that many of the
representations were false or misleading at the time they were made to investors.  In fact,
numerous email communications between Rybicki, Davison (and other EquiAlt marketing
executives) indicate that Rybicki and Davison were well aware that the Funds were
experiencing liquidity problems.

76.     Rybicki also made oral misrepresentations to investors regarding the safety of
investing in the Funds.  Rybicki promised one investor, a retired postal service worker and
veteran who invested more than a million dollars, that he would receive a guaranteed 10%
return on his investment.  In another case involving an unaccredited investor, Rybicki
touted the safety of investing in the EquiAlt Funds promising him that he would receive
steady monthly returns.

77.     Indeed, the liquidity problems were serious enough to force Rybicki and Davison
to change the policy allowing early redemptions.  More specifically, on August 9, 2018,

Rybicki sent an email to Davison and other EquiAlt marketing executives concerning:
"Liquidity of the Fund." In this email, Rybicki stated that he planned to notify EquiAlt's
sales force that EquiAlt was going to change the existing policy of allowing investors to
redeem their investment prior to the maturity date of the debentures. Rybicki explained
that he was changing the policy allowing redemptions upon 60 days' notice in order to
protect the future of the fund. At around the same time, he directed EquiAlt's Senior
Manager for Investors Relations to remove all the language concerning the existing
redemption policy from EquiAlt's marketing materials.

78. Internal communications also indicate that Rybicki and Davison knew that the
investments in the Funds were anything but "low risk," because they knew that they were
paying old investors with funds raised from new investors. For example, in one email
dated June 8, 2019 between Rybicki and Davison, they discussed the need to increase the
liquidity in the EA SIP Fund *before* redeeming an investor's money. The email also
indicates that Rybicki and Davison planned to use new investor funds to redeem old
investor money. In the email, Rybicki states:

> These two investments are being paid back and he is
> going to renew with another 50k but doesn't want to
> be charged 3 investment fees by vantage and
> therefore would like all monies to be under one
> debenture.
>
> Brian, We talked about this a few weeks ago before
> you left and we wanted to raise the liquidity in EA
> SIP before sending back. Over the last 3 weeks we
> raised over 400k to cover the fund *and this return*
> until the money is reinvested. (emphasis supplied).

iii.     **False Statements About Compliance with Applicable Laws, and Management**

79.     EquiAlt falsely told investors in at least one Fund (Fund 2) it was registered with the Commission since 2009.  In truth, neither EquiAlt nor the Funds have ever been registered with the Commission in any capacity.

80.     Written sales materials provided to investors also stated that "payments to licensed brokers and/or finders may be made in compliance with applicable federal and state securities laws."  In reality, during a period of several years the Funds and BR Support Services paid commissions totaling millions of dollars to unlicensed and unregistered sales agents deployed by EquiAlt to market and promote the Funds' investments.

81.     In addition, as detailed above, Rybicki and Davison were informed by multiple attorneys representing third-party sales agents and others that under various securities regulations and laws, the Funds could only be sold by a registered broker -dealer.  Davison and Rybicki chose to ignore these warnings and continued to willfully and intentionally violate the registration laws and to inform third-party sales agents that they did not need to be registered to sell the Funds.

82.     Investors were even misled about the persons involved in managing the Funds. At least two different versions of the PPMs for Funds 1 and 2 identified an individual referred to herein as "DD" as a CPA with an MBA degree who was serving as EquiAlt's Chief Financial Officer.  The description of DD's professional background highlighted DD's prior experience at a Big-Four accounting firm, with SEC reporting requirements, as a CFO of a $100 million real estate mortgage and title company, and as an author.

However, as both Davison and Rybicki were well aware, DD has never worked as EquiAlt's CFO. In fact, she has never worked for EquiAlt in any capacity.

## V. CLAIMS FOR RELIEF

### COUNT I

#### Violations of Sections 5(a) and 5(c) of the Securities Act

#### (Against all Defendants)

83.    The Commission repeats and realleges paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

84.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by the Defendants as described in this Amended Complaint and no exemption from registration existed with respect to these securities.

85.    From January 2011 through February 14, 2020, the Defendants directly and indirectly:

(a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

86.     By reason of the foregoing the Defendants have directly or indirectly violated, and unless enjoined and restrained are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

87.     The Commission repeats and realleges paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

88.     From January 2011 through February 14, 2020, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

89.     By reason of the foregoing, the Defendants have directly or indirectly violated, and unless enjoined and restrained are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Violations of Section 17(a)(2) of the Securities Act
### (Against All Defendants)

90.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

91.     From January 2011 through February 14, 2020, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

92.     By reason of the foregoing, the Defendants have directly or indirectly violated, and unless enjoined and restrained, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### COUNT IV

### Violations of Section 17(a)(3) of the Securities Act
### (Against All Defendants)

93.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

94.     From January 2011 through February 14, 2020,  the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

95.     By reason of the foregoing, the Defendants have directly or indirectly violated, and unless enjoined and restrained, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act
**(Against All Defendants)**

96.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

97.     From January 2011 through February 14, 2020, the Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud.

98.     By reason of the foregoing, the Defendants have directly or indirectly directly violated, and unless enjoined and restrained, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a), thereunder.

## COUNT VI

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act
**(Against All Defendants)**

99.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

100.    From January 2011 through February 14, 2020, the Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly made untrue

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101. By reason of the foregoing, the Defendants have directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), thereunder.

## COUNT VII

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against All Defendants)

102. The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

103. From January 2011 through February 14, 2020, the Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

104. By reason of the foregoing, the Defendants have directly and indirectly violated, and unless enjoined and restrained, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c), thereunder.

## COUNT VIII

### Section 20(a) of the Exchange Act – Control Person Liability

### (Against Davison and Rybicki for EquiAlt, Fund 1, Fund 2, Fund 3 and the EA SIP Fund's Violations of Section 10(b) and Rule 10b-5 of the Exchange Act)

105.    The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

106.    From January 2011 through February 14, 2020, Davison and Rybicki have been, directly or indirectly, control persons of EquiAlt, Fund 1, Fund 2, Fund 3, and the EA SIP Fund  for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

107.    From January 2011 through February 14, 2020, EquiAlt, Fund 1, Fund 2, Fund 3, and the EA SIP Fund violated Section 10(b) and Rule 10b-5 of the Exchange Act.

108.    As control persons of EquiAlt, Fund 1, Fund 2, Fund 3 and the EA SIP Fund are jointly and severally liable with and to the same extent as EquiAlt, Fund 1, Fund 2, Fund 3 and the EA SIP Fund for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

109.    By reason of the foregoing, Davison and Rybicki have directly and indirectly violated, and unless enjoined and restrained, are reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

34

### COUNT IX

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act

### (Against EquiAlt, Davison, and Rybicki)

110.    The Commission repeats and realleges paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

111.    Several unregistered sales agents used by Defendants to sell the Funds' securities acted as brokers or dealers and have made use of the mails or any means or instrumentality of interstate commerce to effect transactions in securities, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered as, or associated  with, the Commission in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), in violation of Section 15(a) of the Exchange Act 15 U.S.C. § 78o(a).

112.    These agents solicited investments in the Funds, provided investors with offering materials, provided advice on the merits of the investment, and received transaction-based compensation.  They have never been registered with the Commission as broker-dealers or associated with a registered broker-dealer.

113.    Defendants  EquiAlt,  Davison,  and  Rybicki,  knowingly  or  recklessly, substantially  assisted  the  violations  of  Section  15(a)  of  the  Exchange  Act  by  these unregistered sales agents.  Unless enjoined, Defendants EquiAlt, Davison, and Rybicki are reasonably  likely  to  continue  to  provide  substantial  assistance  in  connection  with  the violations of Section 15(a) of the Exchange Act by these unregistered sales agents.

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.
### Permanent Injunctive and Permanent Injunction

Issue a Preliminary Injunction and a Permanent Injunction and restraining and enjoining: (1) the Defendants from violating Sections 5(a) and 5(c) and 17(a) of the Securities Act and Sections 10(b) and 15(a)(1) and Rule 10b-5 of the Exchange Act; (2) Davison and Rybicki from violating Section 20(a) of the Exchange Act; and (3) EquiAlt, Davison and Rybicki from aiding and abetting violations of Section 15(a) of the Exchange Act.

### B.
### Asset Freeze

Maintain the Order freezing the assets of the Defendants and Relief Defendants, previously entered.

### C.
### Appointment of a Receiver

Retain the Receiver previously appointed over Defendants EquiAlt, Fund 1, Fund 2, Fund 3, EA SIP Fund, and the Relief Defendants.

### D.
### Records Preservation

Maintain the Order, previously entered, restraining and enjoining Defendants and Relief Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or

36

more of them, and each of them, from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, and of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to Defendants and Relief Defendants, wherever located and in whatever form, electronic or otherwise, that refer or relate to the acts or courses of conduct alleged in this Amended Complaint, until further Order of this Court.

## E.

## Disgorgement and Prejudgment Interest

Issue an Order directing the Defendants and Relief Defendants to disgorge all ill-gotten gains or proceeds received from investors as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

## F.
## Civil Money Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

## G.
## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## H.
## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it

may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury in this case.

Dated: July 9, 2020                          Respectfully submitted,

                                      By:         s/ Alise Johnson
                                                     Alise Johnson
                                                     Senior Trial Counsel
                                                     Fla. Bar No. 0003270
                                                     E-mail: johnsonali@sec.gov
                                                     *Lead Attorney*

                                                     Attorney for Plaintiff
                                                     **SECURITIES AND EXCHANGE COMMISSION**
                                                      801 Brickell Avenue, Suite 1950
                                                     Miami, Florida 33131
                                                     Telephone: (305) 982-6300
                                                     Facsimile: (305) 536-4154

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send a notice of such filing to all counsel of record.

                                                     s/ Alise Johnson
                                                     Alise Johnson